McDonald, j.
State law requires that law enforcement authorities provide certain notices to victims and, in the case of a child victim, to the representative of the victim. Among other things, this requirement allows those specially affected by the criminal justice system to know its workings and perhaps participate in them. In particular, it provides an opportunity for the victim, or the victim’s representative, to be heard at critical junctures in the case, such as sentencing, when the victim’s perspective may be significant to the court’s decision. This is an impor *18 tant responsibility of a prosecutor who, as the representative of the State, has a duty to ensure that “justice shall be done.”[1]
This attorney disciplinary proceeding arises out of a criminal prosecution involving an alleged incident of child sexual abuse. Respondent Bruce Michael Smith, at the time an Assistant State’s Attorney assigned to the Child Advocacy Center in Harford County, was the prosecutor. In that capacity, he was responsible for notifying the 10-year-old victim and her foster mother of their rights under State law, preparing them for the trial, and informing them of critical proceedings in the case. Mr. Smith concedes that he was woefully deficient in carrying out that responsibility with the result that neither the victim nor her foster mother was aware of the prosecution of the alleged assailant, they were not able to participate in sentencing following the defendant’s Alford plea, and they were not aware of the conditions of the defendant’s later release from custody that forbade any contact with the victim. Mr. Smith also concedes that his failure to com-' municate with the victim’s foster mother resulted in his giving incorrect information to the Circuit Court, which caused that court to postpone the original trial date.
We conclude that Mr. Smith failed to act with the reasonable diligence expected of a member of the bar and that his misconduct prejudiced the administration of justice. He is suspended indefinitely from the practice of law, with the right to re-apply no sooner than 60 days from the date that his suspension begins.
I
Background
A. Legal Context — Child Victims and Victim Notiftcation
1. Victim Notification Requirements
The Maryland Constitution confers on victims of crimes the right to be treated with “dignity, respect, and sensitivity” by *19 agents of the State and to be notified and to participate in criminal proceedings, as may be permitted by implementing legislation. Maryland Declaration of Rights, Article 47.[2] The General Assembly has implemented this “strong public policy” by enacting several statutes that create “a class of specific, but narrow, rights for victims.” Hoile v. State, 404 Md. 591, 605, 948 A.2d 30 (2008). In particular, the Legislature has set forth certain guidelines for the treatment and notification of a victim. Maryland Code, Criminal Procedure Article (“CP”), § ll-1002(b). In addition, it has required prosecuting attorneys, law enforcement officers, and certain judicial officials to notify victims of those guidelines. CP § 11-104. When the victim is a minor or incompetent person, a “victim’s representative” — defined as a close relative or guardian of the victim[3] —has similar rights under these statutes.
Under the statutory guidelines, victims are to be provided with certain services, amenities, information and notices, and opportunities to participate in the criminal process.[4] Pertinent to this case, a victim and a victim’s representative, on written request, “should be kept reasonably informed by the police or the State’s Attorney of the arrest of a suspect and *20 the closing of the case, and should be told which office to contact for information about the case.” CP § ll-1002(b)(8). If the alleged crime is a “crime of violence,” such as sexual abuse of a minor in certain circumstances,[5] the victim and victim’s representative should be notified in particular of specified stages of the criminal case, including trial and disposition. CP § 11 — 1002(b)(10). In addition, on request of the State’s Attorney and in the discretion of the trial court, the victim and victim’s representative may submit a victim impact statement and address the court at sentencing. CP § 11-1002(b)(ll). The victim and victim’s representative also have certain rights as to notice when the defendant will be released from custody. CP § ll-1002(b)(14)-(16).
To ensure that victims are aware of their rights, a law enforcement officer or District Court commissioner is to provide the victim or victim’s representative with a pamphlet describing those rights on first contact. CP § ll-104(b). Once charges have been filed and made public, the prosecutor is to provide the victim or victim’s representative promptly with a copy of the pamphlet and a notification request form. CP § ll-104(c). The prosecutor is to certify compliance with that requirement with the clerk of the court. Id. If the victim or victim’s representative completes and files the notification request form, the prosecutor is, to the extent practicable, to give the victim or victim’s representative prior notice of each court proceeding, of the terms of any plea agreement, and of the right to submit a victim impact statement in connection with sentencing. CP § ll-104(e). In addition, that victim or victim’s representative “has the right to attend any proceeding in which the right to appear has been granted to a defendant.” CP § ll-102(a).
2. Child Advocacy Centers
To address what it found to be a lack of “necessary counseling and follow-up services” for sexual assault victims, the *21 General Assembly directed the Governor’s Office of Crime Control and Prevention (“GOCCP”) to establish sexual assault crisis programs in the State, including child advocacy centers. CP § 11-923. The State has designated 21 child advocacy centers throughout the State to provide a “coordinated multidisciplinary approach to the problem of child abuse.” Report of GOCCP on Child Advocacy Centers (January 1, 2015) at 1, available at <wvw.goccp.maryland.gov/victim/documents/ annual-reports/CACS-2014.pdf>. The centers are to provide “safe, child friendly environments for forensic interviews and medical evaluations of the alleged child victim and offer continued support to the child.” Id. The centers are to foster collaboration and “reduce existing gaps in services.” Id. Pertinent to this case, the Harford County Child Advocacy Center (“Center”) was established in 1993 and includes on its staff forensic interviewers, therapists, a pediatrician, local, county, and State law enforcement officers, and Assistant State’s Attorneys. See <http://harfordcac.org/>.

B. Procedural Context

On March 15, 2013, the Attorney Grievance Commission (“Commission”), through Bar Counsel, filed with this Court a Petition for Disciplinary or Remedial Action alleging that Bruce Michael Smith violated various provisions of the Maryland Lawyers’ Rules of Professional Conduct (“MLRPC”) in connection with a child sexual abuse case that he prosecuted while employed by the Harford County State’s Attorney’s Office and assigned to the Center. In particular, the Commission charged Mr. Smith with violating MLRPC 1.3 (diligence), 3.3 (candor toward a tribunal), and 8.4(a), (c), and (d) (misconduct). Pursuant to Maryland Rule 16-752(a), this Court assigned this disciplinary proceeding to Judge Ruth Ann Jakubowski of the Circuit Court for Baltimore County,[6] to conduct *22 a hearing concerning the alleged violations and to provide findings of fact and recommended conclusions of law.
The hearing judge conducted an evidentiary hearing during October 2013, at which three witnesses, including Mr. Smith, testified, and at which the parties submitted a stipulation of facts as well as several documentary exhibits. The hearing judge filed a detailed Statement of Findings of Fact and Conclusions of Law in December 2013. Based on her findings of fact and analysis of the law, the hearing judge concluded that Mr. Smith had violated MLRPC 1.3, but had not violated MLRPC 3.3 or the various subsections of MLRPC 8.4.
The Commission did not except to the hearing judge’s findings of fact, but did except to her conclusion that Mr. Smith did not commit all of the alleged violations; it offered alternative recommendations as to sanction, depending on how we dispose of those exceptions. Mr. Smith filed no exceptions or recommendation as to sanction.

C. Factual Context

Because the hearing judge’s fact findings are uncontested, we treat them as established. Maryland Rule 16-759(b)(2)(A). The hearing judge’s findings and the undisputed evidence in the record established the following facts.

Bar Admission and Employment

Mr. Smith was admitted to the Maryland Bar on December 16, 1999, and is also admitted to practice before the United States District Court for the District of Maryland. He is not a member of the bar of any other state or the District of Columbia.
After working for the Public Defender’s Office, Mr. Smith was hired in 2007 as an Assistant State’s Attorney for Harford County. He prosecuted cases in the District Court. He was also designated as one of the Assistant State’s Attorneys assigned to the Center, which handled cases of child sexual assault and abuse, physical abuse and neglect, child pornography, and internet solicitation of children. As indicated earlier, the Center is also staffed by victim/witness advocates, a *23 forensic interviewer, a family advocate, several detectives, a State trooper, and several child protective service workers.

State v. Head

In 2009, as part of his duties at the Center, Mr. Smith was assigned to prosecute the case of State v. Nathan Elwood Head, in which the defendant was charged with sexual abuse of a minor and a fourth degree sexual offense. According to documents in the State’s Attorney’s file, the 10-year old victim had been brought to the Center in February 2009 by her foster mother. There, a social worker (assisted in some respects by a detective) interviewed the child in some detail concerning an alleged assault by Mr. Head, the 19-year old former boyfriend of her foster sister. The interview was recorded and transcribed, and the matters described by the victim formed the basis of the charges against Mr. Head. The social worker also recorded an interview with the foster sister which was also transcribed and placed in the file.
Charges were filed against Mr. Head, who was in custody on an unrelated charge. Mr. Smith was assigned to prosecute the case. Toward the end of April 2009, Mr. Smith received notice from the Circuit Court for Harford County that the trial would begin on September 8, 2009.
On September 8, Mr. Smith appeared in the Circuit Court and requested a postponement because, according to Mr. Smith, a “necessary, critical witness,” the foster mother of the 10-year old victim, was not available. According to the transcript of that hearing, Mr. Smith stated that he believed the foster mother was in Connecticut for a medical emergency, but said, “I don’t have my note with me.” The trial judge heard from defense counsel, who said “it was [her] understanding that [they] weren’t going to be reached for trial” that day, and did not object to the postponement. Finding good cause, the trial judge postponed the case until January 4, 2010 — well past the October 6, 2009 Hicks date.[7]
*24 On the new trial date, Mr. Smith again appeared at that proceeding as the prosecutor. The defendant entered an Alford plea[8] to a fourth degree sexual offense and was found guilty. The court then proceeded to sentencing. Mr. Head’s attorney and his grandfather addressed the court on his behalf, but neither the victim nor her foster mother was present and the State did not offer a victim impact statement. Mr. Head was sentenced to one year imprisonment, with all but 142 days suspended and with credit for time served, and three years’ probation As a special condition of his probation, Mr. Head was not to have any contact with the victim. There is no indication in the record that anyone from the State’s Attorney’s Office or the Center had contacted the foster mother to advise her of the proceeding prior to the sentencing; nor did anyone subsequently advise her of the conditions of Mr. Head’s probation that related to the victim.

Discovery of Non-Compliance with Victim-Related Responsibilities

More than two years later, in March 2012, when Mr. Head was about to be released from custody, the Division of Correction called the State’s Attorney’s Office to obtain victim contact information and the State’s Attorney’s office volunteered to notify the victim. When the State’s Attorney’s Office contacted the foster mother (who had adopted the child in the meantime) to tell her that Mr. Head was being released from custody, it was surprised to learn that she had no idea that the *25 case had been prosecuted.[9] She had not heard anything from the Center or the State’s Attorney’s Office since reporting her daughter’s allegations of abuse and assault.[10]
The State’s Attorney himself then reviewed his office’s file for State v. Head and the transcripts of the hearings in that case. The file contained the transcribed interviews with the victim and her sister, counsels’ entries of appearance, discovery requests, and the State’s responses to discovery — including a list of potential witnesses that included the victim, her foster mother, a detective, and a social worker. However, the note that Mr. Smith had referenced during the September 8, 2009 hearing when he requested a postponement was not in the file.
Several other items were also noticeably absent from the file. The file did not contain a copy of the victim notification request form that the prosecutor is required to provide the victim. Nor was there any indication whether a completed form had been returned by the victim or whether Mr. Smith had filed the required certification with the court attesting that the form had been sent to the victim. While the file included summonses for the defendant and the investigating detective, there were no summonses for the victim or her foster mother.[11]
*26 According to the State’s Attorney, the prosecutor of a child abuse case is responsible for meeting with the victim to prepare the child for trial, and the office commonly files a notice of intent to use a child victim’s recorded statement at trial. Mr. Smith had apparently neither met with the victim nor attempted to introduce her statement. There was no indication in the prosecutor’s file in the Head case of any communication with the victim or her foster mother between September 8, 2009, the date of the postponement, and the new trial date, January 4, 2010.

Confrontation and Termination of Employment

After being informed that the victim was unaware of the Head prosecution and after reviewing the office file and court file in that case, the State’s Attorney confronted Mr. Smith about his handling of the case, his lack of communication with the victim, and his representations to the trial court that a key witness was unavailable, despite the fact that Mr. Smith had apparently never spoken with her. Mr. Smith, who was visibly shaken at the meeting, told the State’s Attorney that the note he had referenced at the postponement hearing two and a half years earlier should be in the case file, but could not offer any other explanation. The State’s Attorney requested, and received, Mr. Smith’s immediate resignation. He then reported the incident to the Commission, which ultimately led to this proceeding.

The Hearing in this Proceeding

At the hearing in this proceeding, Bar Counsel presented the testimony of the State’s Attorney and the victim’s foster mother. The hearing judge found both to be credible witnesses. In addition, Bar Counsel introduced the State’s Attorney’s file, excerpts from the court file in the Head case and Bar Counsel’s deposition of Mr. Smith, transcripts from the court hearings, and a stipulation of facts concerning Mr. Smith’s career and the Head case.
In his testimony, the State’s Attorney described the nature of the Center and the prosecutor’s general function there, provided some background information concerning Mr. *27 Smith’s employment with his office, and detailed the results of his own investigation into the handling of the Head case. Among other things, the State’s Attorney testified that a trial attorney is to make some kind of contact with the victim concerning the disposition of a case. If the victim is not present at the disposition, a letter is to be sent detailing the outcome or a victim advocate makes contact with the victim or the victim’s representative.[12]
The victim’s foster mother testified as to the events that led her to believe that Mr. Head had sexual contact with her foster daughter and her decision to take the victim to the Center. At the Center she had consented to the audio and video taping of the social worker’s interview of the victim. The foster mother said that she did not hear anything further about the case from anyone at the Center or at the State’s Attorney’s office. She said that she did not initiate any further contact herself on the assumption that the matter had been dropped after their visit to the Center. When contacted three years later about the release of Mr. Head, she was surprised to learn of the prosecution. She said she would have cooperated in the prosecution, had she known about it. She said she had not told anyone at the State’s Attorney’s Office that she would be unable to attend a hearing or trial in the case.
Mr. Smith did not cross-examine either of the Commission’s witnesses. He testified on his own behalf and was cross-examined by Bar Counsel. The hearing judge concluded that *28 he appeared to be “credible, genuine and truthful” in that testimony.
Mr. Smith testified that he had no independent memory of the case but had refreshed his memory by reviewing the file. Concerning his lack of communication with the victim, Mr. Smith said his normal practice was to wait until the eve of trial to prepare a child victim for testifying, in order to minimize the child’s trauma and exposure to the criminal process. The substance of the victim’s testimony was already detailed in the transcription of her interview with the Center’s social worker. According to Mr. Smith, he would have expected the victim to testify on September 9, but that changed when he sought a postponement on September 8, which was why he never held a pre-trial interview with her. By the January trial date, he knew he had reached a plea deal with the defendant, so once again he did not need to bring the victim in to prepare for trial. Like the State’s Attorney, Mr. Smith alluded to the fact that victim’s advocates at the Center would communicate with victims, but admitted that he bore responsibility for the fact that no one had contacted the foster mother.[13]
With respect to the postponement of the initial trial date, Mr. Smith said that someone gave him a note that the foster mother was unavailable for the original trial date. He admitted that the note was not in the file and that there was no evidence in the file of a subpoena for the victim or her foster mother, a victim notification form, or a certification to the court that he had sent the form. While he did not dispute the foster mother’s testimony that she would have been available *29 for a September 2009 trial, he denied a suggestion by Bar Counsel that he had fabricated the idea of a note in order to postpone the case because he was unprepared for trial. On cross-examination, he stated that he had been carrying a heavy District Court caseload at that time and had asked that it be reduced so that he could devote more time to his work at the Center.

Hearing Judge’s Conclusions as to Alleged Violations

The hearing judge found that Mr. Smith failed to exercise reasonable diligence in carrying out his responsibilities in the Head case but that he did not intentionally deceive the trial judge in seeking a postponement of the initial trial date. The hearing judge concluded that Mr. Smith’s admitted lack of diligence was a violation of MLRPC 1.3, but that in the absence of clear and convincing evidence that he intended to deceive the trial court, he had not violated MLRPC 3.3 or 8.4(a), (c), or (d).
II
Discussion
This Court reviews a hearing judge’s conclusions of law de novo — i.e., without any special deference. Maryland Rule 16-759(b)(l). In the course of that review, we consider any exceptions filed by the parties. As noted above, Mr. Smith did not file any exceptions. The Commission excepted to the hearing judge’s conclusions that Mr. Smith violated only MLRPC 1.3 and not the other rules cited in the charged violations. We discuss each of the alleged violations in turn.
Lack of Diligence — MLRPC 1.3
Under MLRPC 1.3, a lawyer is to “act with reasonable diligence and promptness in representing a client.” Unreasonable delay and procrastination in the discharge of one’s duties to a client may result in irreversible prejudice. See MLRPC 1.3, comment [3]. Although neither the victim nor her foster mother was a “client” of Mr. Smith, as the Assistant State’s Attorney assigned to the Head case, he was “the *30 representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is ... that justice shall be done.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935);[14] see also Attorney Grievance Comm’n v. McDonald, 437 Md. 1, 46, 85 A.3d 117 (2014) (a prosecutor is “held to even higher standards of conduct than other attorneys due to [the] unique role as both advocate and minister of justice”) (citation and quotation marks omitted). In that capacity, Mr. Smith was responsible for ensuring compliance with the State’s victim notification law in order to properly carry out his responsibilities as the prosecutor in the Head case.
Mr. Smith agrees that he had ultimate responsibility for compliance with the victim notification obligations — provision of the victim notification form to the victim and her foster mother, communication with the victim and her foster mother about key dates in the prosecution, notification of the foster mother of the disposition of the case and the probation condition that barred Mr. Head from contact with the victim. He concedes that he did none of those things. In connection with the request to postpone the trial, he also concedes that he did not use “due diligence” in verifying the information in the note that he believes he received — that the victim’s foster mother was unavailable on the initial trial date.
*31 We agree with the hearing judge that Mr. Smith failed to “act with reasonable diligence and promptness” in his obligations to communicate with the victim or her foster mother, and in the need to verify information he presented to the court to obtain a postponement. He therefore violated MLRPC 1.3.
Conduct Prejudicial to the Administration of Justice— MLRPC 8.4(d)
Under MLRPC 8.4(d), it is professional misconduct for a lawyer to “engage in conduct that is prejudicial to the administration of justice.” Not every unnecessary delay or failure to carry out duties expeditiously violates this rule. See Attorney Grievance Comm’n v. Zeiger, 428 Md. 546, 559, 53 A.3d 332 (2012) (per curiam) (no MLRPC 8.4(d) violation when attorney’s delay in acting as estate administrator caused no substantial harm to anyone). On the other hand, a repeated failure to communicate with clients (or others) that impairs the discharge of the attorney’s duties in a case can violate the rule. See Attorney Grievance Comm’n v. Brown, 353 Md. 271, 286, 289, 725 A.2d 1069 (1999) (attorney’s failure to communicate with client and appear at hearing violated MLRPC 8.4(d)). “The prejudice to the administration of justice may also be measured by the practical implications the attorney’s conduct has on the day-to-day operation of our court system.” Attorney Grievance Comm’n v. Dore, 433 Md. 685, 710, 73 A.3d 161 (2013). An attorney may also violate MLRPC 8.4(d) when the attorney’s conduct “reflects negatively on the legal profession and sets a bad example for the public at large.” Attorney Grievance Comm’n v. Brady, 422 Md. 441, 460, 30 A.3d 902 (2011).
In her conclusions of law, the hearing judge found that Mr. Smith’s “singular incident of a lack of due diligence” did not violate MLRPC 8.4(d), in large part because he did not act “with the intentionality required” for such a violation — a criterion that the hearing judge derived from our decision in Attorney Grievance Comm’n v. Rand, 429 Md. 674, 716, 57 A.3d 976 (2012).
*32 The Commission devotes the major part of its exceptions to its contention that, contrary to the conclusion of the hearing judge, Mr. Smith’s conduct violated MLRPC 8.4(d). The Commission argues that Mr. Smith’s conduct was not a singular incident, but a continuous course of neglect that spanned at least nine months, from the time the case was assigned to him in March 2009 through the January 2010 plea deal, and even afterwards when he failed to advise the victim or her foster mother of the disposition of the case. It points out that this persistent behavior deprived the victim and her foster mother of the opportunity to exercise, at any time in the Head prosecution, the rights accorded them under Article 47 of the State Constitution and its implementing legislation.
We agree that Mr. Smith’s consistent failure to ensure that the appropriate information and notices were provided to the victim and her foster mother, coupled with his failure to verify the information he says that he received concerning the foster mother’s unavailability for trial, was prejudicial to the administration of justice. The trial — or, as it turned out, alternative disposition — in the Head case was unnecessarily postponed, the victim and victim’s representative were denied their right to observe and perhaps participate in the case, and the sentencing court was denied whatever input the victim might have provided in making that important decision.[15] In our view, Mr. Smith’s conduct was “prejudicial to the administration of justice.”
In concluding that a violation of MLRPC 8.4(d) was not established, the hearing judge accurately quoted our prior decision in Rand as stating that a “mere mistake” by an attorney in that case did not “rise to the level of intentionality required for an 8.4 violation.” Rand, 429 Md. at 716, 57 A.3d 976 (emphasis added). That statement, however, should be *33 understood in the context of the facts of the Rand case. In that case, the issue concerning a possible MLRPC 8.4(d) violation was whether an attorney, who had taken on representation of a group of county correctional officers in a pay dispute, had intentionally misled one officer who had delayed joining the group about that particular officer’s individual legal right to obtain financial relief. The attorney treated that officer similarly to the other members of the group in keeping them informed of the progress of the dispute and their collective interests, but failed to provide the late-joining officer with additional information concerning the consequences of the officer’s delay on his eligibility for some of the relief. The hearing judge in Rand found that the attorney did not have the intent to mislead the late-joining officer and this Court deferred to that finding, with the result that the attorney was held not to have violated MLRPC 8.4(d).
In this case, Mr. Smith’s inaction was more than a “mere mistake.” Rather, it amounted to gross negligence in the discharge of the prosecutorial function. His conduct deprived the child victim and her foster mother of the rights to: (1) know the alleged assailant was being prosecuted, (2) attend the hearings in the case against him, (3) submit a victim impact statement to the court prior to or at his sentencing, and (4) know the terms of the defendant’s probation upon release. Even if he did not affirmatively intend to mislead the court or disadvantage the victim, his conduct threatened the fair and efficient administration of justice.
Accordingly, we sustain Bar Counsel’s exception and hold that Mr. Smith violated MLRPC 8.4(d).
False Statements and Misrepresentations — MLRPC 3.3 and 8.4(c)
The alleged violations of MLRPC 3.3 and 8.4(c) both turn on whether Mr. Smith made a knowing false statement to the trial court in State v. Head at the time he asked for a postponement of the initial trial date. Under MLRPC 3.3, “[a] lawyer shall not knowingly ... make a false statement of fact or law to a tribunal or fail to correct a false statement of *34 material fact or law previously made to the tribunal by the lawyer.” This requirement is referred to as “candor towards the tribunal.” It is based on the idea that “[ejvery court has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it. Therefore, candor and fairness should characterize the conduct of an attorney at the beginning, during, and at the close of litigation.” Dore, 433 Md. at 703, 73 A.3d 161 (quoting In re Discipline of Wilka, 638 N.W.2d 245, 249 (S.D.2001)) (ellipses omitted). In order to establish a violation of MLRPC 3.3, there must be clear and convincing evidence, not only that an attorney provided false information, but also that the attorney knew the information to be false. Attorney Grievance Comm’n v. Ward, 394 Md. 1, 32, 904 A.2d 477 (2006).
A violation of MLRPC 3.3 will also often violate MLRPC 8.4(c) as both provisions concern dishonest conduct. See Dore, 433 Md. at 707, 73 A.3d 161. Under MLRPC 8.4(c), a lawyer is not to “engage in conduct involving dishonesty, fraud, deceit or misrepresentation.” An attorney who knowingly tells a client or a court a falsehood on a matter material to the hearer can violate MLRPC 8.4(c), even if the attorney has no intent to defraud anyone. See, e.g., Attorney Grievance Comm’n v. Siskind, 401 Md. 41, 70, 930 A.2d 328 (2007) (“words spoken by an attorney who knows they were untrue involves an inherent intent to deceive”); Attorney Grievance Comm’n v. Reinhardt, 391 Md. 209, 222, 892 A.2d 533 (2006) (telling a client a lie about the progress of her case out of embarrassment violated MLRPC 8.4(c)). While this Court has sometimes drawn fine distinctions among the four horsemen of the rule — dishonesty, fraud, deceit and misrepresentation — each pertains to a false statement by an attorney only if the attorney makes use of the false statement knowing that it is untrue.
It is undisputed that Mr. Smith gave the hearing judge false information when he requested the postponement in September 2009. The foster mother was not in another state, had no medical emergency, and had not contacted the State’s Attorney’s Office about her unavailability. Whether Mr. Smith *35 violated MLRPC 3.3 or 8.4(c) thus depends on whether he knew that information was false when he provided it or had an opportunity to correct it. As noted above, the hearing judge found Mr. Smith’s testimony before her to be “genuine” and “credible” and accepted his explanation that he had been relying on a note that he received that he thought pertained to the foster mother, although he did nothing to verify it. Accordingly, the hearing judge found that there was not clear and convincing evidence of a necessary element of the charges under MLRPC 3.3 and 8.4(c).
The Commission has excepted to that conclusion. The Commission argues that Mr. Smith must have intentionally misled the trial court because, in its view, he was likely unprepared for trial and needed a reason to postpone the trial past the Hicks date. The Commission reasons that, as Mr. Smith had not communicated directly with the victim or foster mother about the case, it was unlikely that the foster mother would try to contact him about missing a trial date. It also argues that he should have contacted the foster mother at some point before the new trial date to prepare her for trial, and discounts his explanation that he did not do so because of the anticipated Alford plea. The Commission infers that Mr. Smith was intentionally dishonest.
The determination as to whether Mr. Smith violated MLRPC 3.3 and 8.4(c) turns on an assessment of his credibility when he testified that he did not purposely mislead the Circuit Court at the hearing on September 8, 2009. As this Court has reiterated on numerous occasions, we defer to the fact findings of the hearing judge “because she is in the best position to assess first hand a witness’s credibility.” Attorney Grievance Comm’n v. Sheridan, 357 Md. 1, 17, 741 A.2d 1143 (1999). This is particularly true when it comes to assessing an attorney’s state of mind as to an intent to deceive. “We are constrained to accept that assessment, particularly given the judge’s superior ability to evaluate demeanor-based credibility.” Sheridan, 357 Md. at 29, 741 A.2d 1143; see also Attorney Grievance Comm’n v. Tanko, 427 Md. 15, 49, 45 A.3d 281 (2012) (deferring to trial judge’s credibility determinations *36 regarding the attorney’s intent to deceive, or lack thereof, for purposes of assessing alleged MLRPC 8.4(c) violation).
It is evident from the detailed findings of fact that the hearing judge carefully considered the testimony and other evidence presented at the hearing, including Mr. Smith’s testimony. From the perspective of a reviewing court, we cannot say that the hearing judge’s assessment of Mr. Smith’s credibility was clearly erroneous. Accordingly, we overrule the Commission’s exceptions to the hearing judge’s conclusions regarding the alleged MLRPC 3.3 and 8.4(c) violations and decline to find violations of those provisions.

MLRPC 8.4(a)

Under MLRPC 8.4(a), “[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the [MLRPC], knowingly assist or induce another to do so, or do so through the acts of another.” As this Court has frequently stated, when an attorney violates a rule of professional conduct, the attorney also violates MLRPC 8.4(a).[16] As we have found violations of MLRPC 1.3 and 8.4(d), perforce there is also a violation of MLRPC 8.4(a).[17]
Ill
Sanction
The underlying purpose of attorney disciplinary proceedings — and any sanction imposed — is protection of the public, not punishment of the attorney. When imposed, a *37 sanction “should be commensurate with the nature and gravity of the violations and the intent with which they were committed, taking into account the particular circumstances of each case and any aggravating or mitigating factors.” Attorney Grievance Comm’n v. Khandpur, 421 Md. 1, 18, 25 A.3d 165 (2011) (internal quotations omitted). The Court frequently looks to a list of possible aggravating and mitigating factors identified by the American Bar Association’s Standards for Imposing Lawyer Sanctions, §§ 9.22, 9.32, reprinted in Compendium of Professional Responsibility Rules and Standards (2012) . See, e.g., Attorney Grievance Comm’n v. Shapiro, 441 Md. 367, 406-07, 108 A.3d 394 (2015); Attorney Grievance Comm’n v. Coppock, 432 Md. 629, 648-49 & nn. 17-18, 69 A.3d 1092 (2013).
The hearing judge found no aggravating factors. As to mitigating factors, the hearing judge found that Mr. Smith accepted responsibility for failing to contact the victim and her foster mother, that he was not dishonest, and that he was cooperative during the proceedings. We add that there is no evidence that Mr. Smith has a prior disciplinary record.
The Commission recommends that, if this Court does not find violations of MLRPC 3.3 and 8.4(c), we suspend Mr. Smith indefinitely with the right to apply for reinstatement in 60 days.[18] As noted above, Mr. Smith did not file a recommendation as to the appropriate sanction for what he admits *38 was a serious dereliction of his duties as a prosecutor. When pressed at oral argument, he suggested a public reprimand, in light of the fact that the incident cost him his job.
We accept the Commission’s recommendation. We have concluded that Mr. Smith failed to act with the reasonable diligence expected of a member of the bar and that his inaction was prejudicial to the administration of justice in the prosecution of a child sexual abuse case and in the State’s compliance with the rights accorded victims under State law. These are serious violations, but the hearing judge found they were not committed with fraudulent or deceitful intent. This Court has often referenced the lack of fraudulent intent when imposing a suspension — in lieu of disbarment — for serious violations. See, e.g., Khandpur, 421 Md. at 20, 25 A.3d 165; Attorney Grievance Comm’n v. Nichols, 405 Md. 207, 218, 950 A.2d 778 (2008). An indefinite suspension is appropriate. The recommended period of suspension is consistent with the sanction imposed in prior cases in which the misconduct consisted at least in part of a lack of reasonable diligence. See, e.g., Attorney Grievance Comm’n v. Mooney, 359 Md. 56, 97-98, 753 A.2d 17 (2000) (indefinite suspension with the right to re-apply in 90 days when attorney failed to act with reasonable diligence, as well as committed numerous other violations with respect to four clients). In light of the mitigating factors found by the hearing judge, Mr. Smith may reapply no sooner than 60 days after the beginning of his suspension.
It is so Ordered; Respondent Shall Pay All Costs as Taxed By the Clerk of This Court, Including the Costs of All Transcripts, Pursuant to Rule 16-761, for Which Sum Judgment is Entered in Favor of the Attorney Grievance Commission Against Bruce Michael Smith.
HARRELL, BATTAGLIA, and WATTS, JJ., concur and dissent.

. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); see footnote 14 below.

. Article 47, which was adopted in 1994, provides as follows:
(a) A victim of crime shall be treated by agents of the State with dignity, respect, and sensitivity during all phases of the criminal justice process.
(b) In a case originating by indictment or information filed in a circuit court, a victim of crime shall have the right to be informed of the rights established in this Article and, upon request and if practicable, to be notified of, to attend, and to be heard at a criminal justice proceeding, as these rights are implemented and the terms "crime,” "criminal justice proceeding,” and "victim” are specified by law.
(c) Nothing in this Article permits any civil cause of action for monetary damages for violation of any of its provisions or authorizes a victim of crime to take any action to stay a criminal justice proceeding.

. See CP § ll-1001(f).

. For example, the statute provides that, to the extent practicable, victims should be provided crisis intervention help and employer intercession services, and a waiting area in the courthouse separate from the suspect. CP§ 11 — 1002(b)(2), (5), (7).

. See CP § 1-101(e); Maryland Code, Criminal Law Article, § 14-101(a)(16).

. This Court initially designated Judge William O. Carr of the Circuit Court for Harford County, but upon request of that court re-assigned the case to Judge Jakubowski.

. Maryland Rule 4-271 requires that a criminal trial be scheduled within 180 days of the appearance of counsel or the defendant's first *24 appearance before the circuit court, whichever is earlier, unless the trial date is postponed for good cause. The rule’s deadline for commencing trial is sometimes referred to colloquially as the “Hicks date” — a reference to State v. Hicks, 285 Md. 310, 318, 403 A.2d 356 (1979), in which this Court held that the sanction for a violation of the predecessor version of Rule 4-271 was dismissal of the charges. As noted above, if the court finds good cause for the postponement there is no violation of the rule.

. In an Alford plea, a defendant admits that the State has sufficient evidence to obtain a conviction, but does not admit to committing the crime. See North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

. The record does not indicate who at the State’s Attorney's Office made the contact.

. It remains a bit of a mystery in this record as to why there was apparently no effort by anyone at the Center to follow up with the victim or her foster mother from the time of her interview in February 2009 until three years later. In any event, Mr. Smith was as emphatic in taking responsibility for the State's lack of communication with the victim as he was in denying that he intentionally misled the trial court. He testified that “it is without question that responsibility rested on my shoulders. Whether it was assigned to administrative staff or not, I'm responsible for ensuring that it's getting done and it did not get done.”

. According to the Harford County State’s Attorney, the clerical staff in his office prints summonses for each trial, and the attorney assigned to the case reviews and signs them before sending them out.

. The State's Attorney testified regarding the usual practice in the Child Advocacy Center of contacting victims after trial as follows:
Bar Counsel: All right. Was it Mr. Smith’s responsibility to notify the victim of the, of disposition of the charges against Mr. Head?
[State's Attorney]: I mean, generally with these kind of cases, the attorney does make some kind of contact but we also have a system where a letter, if the victim is not present in Court, there is a letter sent to the victim detailing the outcome of the case and often either one of the — because of the contacts with the victim, the victim advocate or family advocate makes contact and let [sic] them know what the outcome is.

. At the hearing, the following exchange took place:
Bar Counsel: Based on your review of the file, what was it that you had done to alert [the foster mother] that there was going to be a trial on September the 8th of 2009?
Mr. Smith: I — there's nothing that shows in the file any contacts. I have no idea what did or did not take place with that. I have no idea whether any of the victim advocates had either attempted to contact her or did not contact her.
Bar Counsel: But it was your job to—
Mr. Smith: Ultimately it was my responsibility to ensure that would take place, yes.

. In an oft-quoted passage, the Supreme Court described the role of the prosecutor:
The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

. The record in this case does not tell us whether the victim in the Head case — or her foster mother — would have had some useful input for the trial judge to consider when she sentenced Mr. Head. But it is the opportunity to provide such input that is important and underlies the statutory obligation to notify victims in certain cases of key proceedings when the victim requests such notice.

. See, e.g., Attorney Grievance Comm’n v. Nelson, 425 Md. 344, 363, 40 A.3d 1039 (2012).

. The hearing judge did not separately discuss MLRPC 8.4(a) in the recommended conclusions of law, but did subsume it in her conclusion that the Commission had not provided clear and convincing evidence of the requisite intent for violations of MLRPC 8.4 generally. The Commission did not except separately as to the failure to find a violation of MLRPC 8.4(a). Because there is no special intent requirement for a violation of 8.4(a) and because we conclude that Mr. Smith violated MLRPC 1.3 and MLRPC 8.4(d), we find that there was a violation of MLRPC 8.4(a). We need not belabor the point because, as a simple reflection of the other violations found, it adds nothing to our consideration of the appropriate sanction.

. In the event we granted the Commission’s exceptions and found violations of MLRPC 3.3 and 8.4(c), the Commission initially recommended disbarment. At oral argument, however, in light of our recent decision in Attorney Grievance Comm’n v. Litman, 440 Md. 205, 101 A.3d 1050 (2014), Bar Counsel modified its position to recommend an indefinite suspension with the right to reapply in six months if we found that Mr. Smith had violated MLRPC 3.3 and 8.4(c).
In Litman, 440 Md. at 218, 101 A.3d 1050, this Court rejected the Commission’s recommendation for disbarment when an attorney “misrepresented facts to tribunals in an attempt to further his client’s goals.” We noted that “we have not ... always found disbarment to be the appropriate sanction when there is misrepresentation involved, especially when misappropriation of money is not involved,” and indefinitely suspended the attorney with the right to reapply in six months. *38 Id., at 218, 101 A.3d 1050 (quoting Attorney Grievance Comm’n v. Sperling, 432 Md. 471, 69 A.3d 478 (2013)) (ellipses added).